IN THE
UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
PEORIA DIVISION

| | |
|---|---|
| JIMIA STOKES,<br>　　　　Plaintiff,<br><br>v.<br><br>WEXFORD HEALTH SOURCES,<br>INC. and ILLINOIS DEPARTMENT<br>OF CORRECTIONS,<br>　　　　Defendants. | Case No. 1:21-cv-01075-JEH |

## Order

Now before the Court are Defendant Illinois Department of Corrections' (IDOC) Motion for Summary Judgment (Doc. 111), Defendant Wexford Health Sources, Inc.'s (Wexford) Motion for Summary Judgment (Doc. 114), and the Plaintiff's Emergency Motion to Strike Defendant Wexford's Dkt 114 Statement of Facts & Dkt 131, Its Reply Brief, and for Rule 11 Sanctions & a Prayer for Leave to Amend a Rule 56 Response if Necessary with Plaintiff's Counsel Withdrawal (Doc. 132).[1] The Motions are fully briefed, and for the reasons set forth below, Defendant IDOC's Motion is GRANTED, Defendant Wexford's Motion is GRANTED IN PART AND DENIED IN PART, and the Plaintiff's Emergency Motion is DENIED.[2]

## I

Plaintiff Jimia Stokes filed her original complaint in the U.S. District Court for the Northern District of Illinois. After this case was transferred to this Court in March 2021, the Plaintiff filed a Second Amended Complaint for Monetary

---

[1] Citations to the Docket in this case are abbreviated as "(Doc. ___)."

[2] The parties consented to the jurisdiction of a U.S. Magistrate Judge. (Docs. 64, 65).

Relief (Doc. 76) on June 28, 2022 against Defendants IDOC and Wexford claiming violations of Title VII, 42 U.S.C. § 2000e, *et seq*. and 42 U.S.C. § 1981. Specifically, the Plaintiff alleged that while employed by both Defendants as a "mental health worker" at an IDOC site in Pontiac, Illinois in 2018, she was treated less favorably by the Defendants because she is a women and is black, she was sexually harassed and subjected by both Defendants to a hostile work environment, and the Defendants' misconduct was in pursuit of sexual harassment and retaliation. (Doc. 76 at pg. 3). The Plaintiff stated in her Amended Response in Opposition to Both Defendants' Respective Motions for Summary Judgment (Doc. 128) that she "hereby dismisses her 42 USC 1981 claim." (Doc. 128 at pg. 11). The Court accordingly limits its summary judgment analysis to the Plaintiff's Title VII claims.

## II

## A

As an initial matter, the Court notes Defendant Wexford's argument that the Plaintiff's Amended Response should be stricken for failure to comply with Federal Rule of Civil Procedure 56(c) and several subsections of Civil Local Rule 7.1(D). Indeed, after Defendant Wexford pointed out in its original Reply (Doc. 125) the deficiencies in the Plaintiff's original Response (Doc. 122) to the Defendants' Motions for Summary Judgment, the Court struck the Response for failure to comply with Fed. R. Civ. P. 56(e) and Civil Local Rule 7.1(D)(2). The Court directed the Plaintiff to file amended responses after warning the Plaintiff that filings not in compliance with Civil Local Rule 7.1(D) may be stricken. That the Plaintiff's Amended Response did not much improve upon the original Response's shortcomings is illustrated by the fact that the original filing was 78 pages while the amended filing is 84 pages.

Nevertheless, and while the Plaintiff's Amended Response certainly does not comply with the spirit of Civil Local Rule 7.1(D), the Amended Response is

not entirely deficient.  Even if the Court were to strike the entirety of the Plaintiff's Amended Response, the Court still has an obligation to review the record and determine whether summary judgment is proper given the undisputed facts, "with those facts taken as usual in the light most favorable to the nonmovant." *Robinson v. Waterman*, 1 F.4th 480, 483 (7th Cir. 2021).  The Court will not consider any of the Plaintiff's responses to the Defendants' respective statements of fact that amount to legal conclusions or argument.  *See, e.g.*, Plf Amend. Resp. (Doc. 128 at pg. 20) (stating conclusion that the Plaintiff was sexually harassed by the warden in response to Wexford's Statement of Fact 14); (Doc. 128 at pgs. 22, 23) (presenting argument in response to Defendant Wexford's Statements of Fact 20 and 24).

The Court will, however, strike the Plaintiff's Rule 56 Summary Judgment Declaration (Doc. 129) dated August 6, 2023 in its entirety.  The Declaration is untimely as it was filed after discovery in this case closed and after the Defendants filed their Motions for Summary Judgment.  While a party may offer an affidavit in response to a summary judgment motion "to clarify ambiguous or confusing testimony," such is not the situation here.  *Kopplin v. Wis. Cent. Ltd.*, 914 F.3d 1099, 1103 (7th Cir. 2019).  In fact, the Plaintiff several times states in opposition to the summary judgment Motions that she was not asked a given question or asked about a given topic at her deposition.  *See, e.g.*, Plf Amend. Resp. (Doc. 128 at pg. 22) ("[Wexford Statement of Fact 20's] claim that Plaintiff was 'receptive' is disputed . . . and the Plaintiff was not asked at her deposition if she was receptive").  That does not change the fact that she was deposed with her own counsel present and was otherwise provided a full and fair opportunity to gather evidence and to present facts, all during the discovery phase of this case.  The August 6, 2023 Declaration is essentially the Plaintiff's attempt to present a new set of facts not otherwise appearing in the record *before* the summary judgment motions were filed.  *See Foster v. PNC Bank, Nat'l Ass'n*, 52 F.4th 315, 320 (7th Cir.

3

2022) ("a nonmoving party at the summary judgment stage cannot rest upon conclusory statements in affidavits; they must go beyond the pleadings and support their contentions with proper documentary evidence").  An affidavit may contradict sworn deposition testimony if it is based on newly discovered evidence. *Kopplin,* 914 F.3d at 1103.  Again, here, that is not the situation; for example, the Plaintiff made a statement in her Declaration about an incident report she "learned about in the instant law suit [sic] *Discovery* [sic] *process*."  Plf Amend. Resp. (Doc. 128 at pg. 27) (emphasis added).  While a new affidavit may be appropriate if the earlier testimony was the result of a memory lapse, nothing in the Plaintiff's Amended Response or Declaration reflects that to be the situation.  *Id*.  Rather, the Plaintiff was purportedly able to recall facts in August 2023 (five years from the period set forth in her Second Amended Complaint) that she was unable to recall on February 8, 2022 (her deposition date) and notably in response to evidence that was produced *before* the summary judgment Motions were filed.  Finally, Defendant Wexford's additional reasons for striking the Declaration are well taken.  Some of the Plaintiff's included statements are based upon speculation and conjecture (3-4, 6, 26-27), others are self-serving without factual support in the record (8-9), and others present legal argument (11, 13).  *See Butts v. Aurora Health Care, Inc.*, 387 F.3d 921 (7th Cir. 2004) ("self-serving statements in affidavits without factual support in the record carry no weight"); *see also Foster*, 52 F.4th at 320 ("Mere speculation cannot be used to manufacture a genuine issue of fact"); a*nd Hoosier v. Greenwood Hospitality Mgmt. LLC*, 32 F. Supp. 3d 966, 971 (N.D. Ill. 2014) ("an affidavit that includes general opinions and beliefs does not create a genuine issue of material fact sufficient to defeat summary judgment") (citing *Cleveland v. Porca Co.*, 38 F.3d 289, 295 (7th Cir. 1994)).

The Plaintiff's Emergency Motion to Strike Defendant Wexford's Dkt 114 Statement of Facts & Dkt 131, Its Reply Brief, and for Rule 11 Sanctions & a Prayer

for Leave to Amend a Rule 56 Response if Necessary with Plaintiff's Counsel Withdrawal (Doc. 132) is denied in light of the foregoing and following. First, as for the request to strike Defendant Wexford's Statement of Facts appearing in its Motion for Summary Judgment filed on July 17, 2023, the Plaintiff's request is untimely. The request to strike was made on December 14, 2023, five months after Wexford filed its Motion, and the Plaintiff did not raise any challenge to Wexford's Statement of Facts (save one for an entirely different reason) in her original Response (Doc. 122). In any event, the Court has determined it will not strike the Plaintiff's Amended Response such that it will certainly not now strike Defendant Wexford's July 17, 2023 Statement of Facts. Second, for the reasons explained above, Wexford's challenge to the Plaintiff's Declaration is not frivolous, contrary to the Plaintiff's argument. Third, the Plaintiff's request to strike Wexford's Reply (Doc. 131) is essentially moot given that the bulk of the Reply challenges the Plaintiff's Amended Response which the Court has already determined is not entirely deficient and will be considered rather than stricken. All of this does away with the Plaintiff's request to impose sanctions on Defendant Wexford. Lastly, Plaintiff's counsel's request he be permitted to withdraw in order for the Plaintiff to retain a new attorney to write a further amended response is moot in light of the fact that the Court has determined it will consider rather than strike the Plaintiff's Amended Response (Doc. 128).

**B**

The undisputed facts are as follows.[3] The Plaintiff was formerly employed by Defendant Wexford – she was hired as a Qualified Mental Health Professional by Wexford on February 26, 2018. She was assigned by Wexford to the IDOC Pontiac Correctional Center (Pontiac) Health Care Unit. Pontiac is an adult, male,

---

[3] Taken from both Defendants' and the Plaintiff's briefs.

medium security prison.  Wexford contracts with Defendant IDOC to provide mental health counseling services for all of IDOC's roughly 30 sites in Illinois, and in addition, IDOC has its own mental health department and employs its own mental health staff.  Wexford employees are provided with Wexford employment manuals and policies.  The Plaintiff did not receive an IDOC employee handbook, was not provided with an IDOC uniform, and did not receive a copy of IDOC's dress code policy.  IDOC regulations governing Pontiac dictate and require, "Non-uniformed employees shall dress professionally in attire that is considered to be appropriate for their respective assignments."  Dft Wexford Exh. B (Doc. 113-2 at pg. 7).  Rules governing work attire for Wexford employees are enforced to ensure that staff dresses appropriately for the environment in which they work because inappropriate dress has the potential to become a safety and security issue.  Teri Fitzmaurice, Wexford's Site Manager/Office Coordinator, testified at her deposition that IDOC sets clothing standards for security purposes and to ensure the safety of employees so that there are no issues with the individuals in custody.  IDOC sets the clothing and grooming standards at Pontiac and the standards are enforced by supervisors.  Wexford has its own Personal Appearance policy contained in its Employee Handbook, of which the Plaintiff acknowledged receipt, which provides:

> If you are uncertain as to the appropriateness of an outfit, please discuss it with your manager prior to wearing it to work . . .
> As a contractor operating in clients' facilities, individual sites have the authority to define appropriate standards of personal appearance including attire, footwear, grooming, personal hygiene, accessories (e.g., jewelry, piercings, tattoos, etc.). At some locations, employees in certain positions may be required to wear uniforms of a defined style and color. Compliance with each facility's standards of personal appearance is required.  If it is determined that you are not in compliance with the standards of personal appearance at your location, you will be required to leave the workplace to change attire

or otherwise comply with the standard at issue and then return to work.

Dft Wexford Exh. F (Doc. 135 at pgs. 36-37).

As a contractor, Wexford, through its employees, has an obligation to follow IDOC's rules and regulations while working in their facilities. Proper work place attire is part of Wexford's requirements for professional presentation and conduct within the work environment. The Plaintiff reported to Dr. John Sokol, who at the time of Jimia's employment held the position of Mental Health Services Director for Wexford and was employed by Wexford. He supervised and had the ability and authority to discipline the Plaintiff. Dr. Sokol's supervisor was Dr. Robert Woods, another Wexford employee. Dr. Sokol only had the ability to discipline Wexford staff, specifically only Wexford's mental health staff, and not the IDOC staff.

On May 16, 2018, Dr. Sokol's predecessor, Dr. Priscilla DuBois, completed a Wexford memorandum regarding the Plaintiff's performance expectations, which noted concerns about Jimia's performance since her February 2018 start date, including: 1) arriving late to work on three consecutive days; and 2) she was insubordinate when she refused directives to leave her immediate supervisor's office while the supervisor was having a discussion with a co-worker that did not involve Jimia. On June 21, 2018, Emily Ruskin, IDOC's Assistant Warden of Programs at Pontiac, asked the Plaintiff if she had been wearing a shirt with her belly showing that day because that is what someone reported to Ruskin. That same day, June 21st, the Plaintiff submitted a Wexford Incident Report claiming someone made a false report about her clothing, and "[t]his type of workplace scrutiny makes [the Plaintiff] feel uncomfortable and unfairly targeted by unknown staff members due to [the Plaintiff] being a minority . . . ." Dft Wexford Exh. F (Doc. 135 at pg. 31).

7

On Saturday, July 7, 2018, Lieutenant Joy Henry of IDOC approached the Plaintiff in the health care unit of Pontiac and told her that her nipples were protruding through her clothing, which is a policy violation.  Lt. Henry directed the Plaintiff to follow her to Major John Wheat's office to further discuss the matter.  The Plaintiff asked Major Wheat if her attire was inappropriate in response to which he told her that it was and she needed to change.  On July 7th, the Plaintiff sent an email to Dr. Sokol, Dr. Woods, Major Wheat, and Kelli Renzi (an actual supervisor who worked over Dr. Sokol) describing her July 7th interaction with Lt. Henry during which Lt. Henry said to Jimia, "Expressing your sexuality outside of prison is one thing but bringing your sexuality into a prison is unacceptable."   Plf Exh. 8 (Doc. 128-1 at pg. 353).[4]   The Plaintiff reportedly responded, "I have agreed to address the unbeknownst to me issue with my nipples; however, I will not allow you to insult and disrespect me and say that I am bringing my sexuality into the prison; my sexuality has nothing to do with my nipples."  *Id.*

Lt. Henry completed an IDOC Incident Report on July 9, 2018 relative to the July 7th incident which stated, in relevant part:

> On multiple occasions and at at least 2 cellhouses this R/Lt. [Reporting Lieutenant] has previously witnessed MHP [Mental Health Professional] dressed inappropriately in a shirt which did not adequately conceal her [redacted]. This has been an ongoing issue that several staff and other supervisors have brought to my attention. * * * today this R/Lt., once again, observed that MHP Stokes [redacted]. * * * This R/Lt. informed MHP Stokes that her clothing was not adequately [redacted] that this was inappropriate attire for the prison environment and that she should choose clothing that was less revealing. * * * This R/Lt. stated that expressing her sexuality outside of work was one thing, but she needed to be fully covered while at work, that she was unnecessarily putting herself and other

---

[4] Defendant Wexford attributed this statement of fact to the wrong exhibit and the wrong date.

staff in danger. At that point MHP Stokes began to get agitated, raised her voice, and said this R/Lt. was implying she [redacted]. * * *

Dft Wexford Exh. J (Doc. 113-10 at pgs. 14-15) (redactions in original unsealed filing).

On July 10, 2018, the Plaintiff sent an email to Dr. Sokol, Fitzmaurice, Dr. woods, Kelly Renzi, and Kathy Kissiar (union represenrative) attaching two pages of her typed-up notes that she requested to be placed in her personnel file and in which she revisited the incident with Lt. Henry regarding Plaintiff's nipples. The Plaintiff stated further, "I am the only African American Mental Health Professional in what is predominately a Caucasian workforce to be subjected to this type of treatment and communication makes me feel that I am being scrutinized and objectified unfairly . . . ." Dft Wexford Exh. F (Doc. 135 at pg. 18). Also on July 10th, the Plaintiff completed a Wexford Incident Report regarding the July 7th incident which largely reiterated what she stated in her notes attached to the July 10th email. On July 11, 2018, the Plaintiff sent an email to Dr. Sokol, Assistant Warden Ruskin, Dr. Woods, Kelly Renzi, Kathy Kissiar, and Fitzmaurice to which she attached an IDOC Incident Report relative to the July 7th incident (and dated July 7th) she completed. The Plaintiff's July 7th IDOC Incident Report included that Lt. Henry told her, "You are not dressed appropriately; your nipples are a problem." Dft Wexford Exh. F (Doc. 135 at pg. 20). In her July 11th email, the Plaintiff reported that Assistant Warden Ruskin and Major Susan Prentice spoke with her that morning regarding the July 7th incident with Lt. Henry.

On July 14, 2018, the Plaintiff sent an email to Dr. Sokol stating in part, "I feel I am being harassed, my professional integrity and reputation being tarnished and my personal safety is being jeopardized, due to the Leadership among both mental health and security staff appearing to allow me 'the victim' to be made a mockery of for the inappropriate behavior of staff here at Pontiac Correctional

Facility."  Dft Wexford Exh. F (Doc. 135 at pg. 12).  She further complained of
"feel[ing] all alone, [her] experiences minimized, marginalized and deflected due
to the strained relationship between mental health and security staff."  *Id*.
Attached to her July 14th email was a Wexford Incident Report wherein the
Plaintiff stated an inmate reported to her that he (the inmate) overheard Major
Prentice tell the Plaintiff to cover up, that another Wexford mental health
professional named "Manisero"[5] did not like her, and cautioned that the Plaintiff
had haters.  Dft Wexford Exh. L (Doc. 135 at pg. 14).  The inmate reportedly told
the Plaintiff he heard the information from a white female officer.  *Id*.

On July 17, 2018, the Plaintiff completed a Wexford Incident Report
documenting a meeting she was called into that day with Drs. Sokol and Woods.
The Plaintiff noted her concern that IDOC staff was filing complaints against her
behind her back, and that those complaints were being raised in retaliation for the
Plaintiff's July 7th complaint against Lt. Henry.  Dft Wexford Exh. F (Doc. 135 at
pgs. 9-10).  On July 21, 2018, the Plaintiff sent herself an email documenting a
conversation with Lt. Reginald Brewer during which the Plaintiff told Brewer she
wrote an incident report about Lt. Henry who made inappropriate references to
the Plaintiff's body parts on July 7th and the ensuing discussion in Major Wheat's
office.  Lt. Brewer reportedly responded, "You're the reason I overheard Major
Wheat jokingly" refer to himself as the "nipple police."  Dft Wexford Exh. L (Doc.
113-12 at pg. 6).  Per Jimia, she expressed her concern to Lt. Brewer that it made
her uncomfortable and hurt her professional reputation for the prison to be
discussing the incident.  *Id*.

On September 28, 2018, the Plaintiff submitted an IDOC Incident Report in
which she reported she was made to wait at a security check point in between

---

[5] Defendant Wexford identifies this individual as "Manisero," but the Plaintiff identifies this individual as "Sheila Molinero."

entry doors.  Dft Wexford Exh. F (Doc. 135 at pg. 8).  The Plaintiff wrote it was not the first time she had been made to wait an unusually long time to gain entry and was concerned that it was in retaliation for submitting an incident report concerning another correctional officer the previous day.

IDOC undertook an investigation of the July 7, 2018 incident consisting of interviews completed by Lt. Henry, Major Wheat, IDOC Corrections Officers Kendra Ramey, Cynthia Wollenzien, and Crystal Griffith, Dr. Sokol, and the Plaintiff.  IDOC concluded on November 13, 2018 that the Plaintiff violated its Code of Conduct for her unprofessional conduct displayed during her July 7th interaction with Lt. Henry.

Ultimately, the Plaintiff was never assigned to a different facility and never requested to transfer facilities.  She never had her pay cut or reduced.  The Plaintiff resigned her employment with Wexford on November 14, 2018 with an effective date of November 27, 2018.  She addressed her resignation letter to Wexford.  Her resignation letter made no mention of sex or race-based discrimination, retaliation, or any other grievance.  The Plaintiff obtained new employment shortly after she resigned from Wexford.

### III

Summary Judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  The moving party has the burden of providing proper documentary evidence to show the absence of a genuine issue of material fact.  *Celotex Corp.*, 477 U.S. at 323-24.  Once the moving party has met its burden, the opposing party must come forward with specific evidence, not mere allegations or denials of the pleadings, which demonstrates that there is a genuine issue for trial.  *Gracia v. Volvo Europa Truck, N.V.*, 112 F.3d 291, 294 (7th Cir. 1997).  "[A] party moving for

summary judgment can prevail just by showing that the other party has no evidence on an issue on which that party has the burden of proof." *Brazinski v. Amoco Petroleum Additives Co.*, 6 F.3d 1176, 1183 (7th Cir. 1993).

Accordingly, the non-movant cannot rest on the pleadings alone, but must designate specific facts in affidavits, depositions, answers to interrogatories, or admissions that establish that there is a genuine triable issue; he "must do more than simply show that there is some metaphysical doubt as to the material fact." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *Hot Wax, Inc. v. Turtle Wax, Inc.*, 191 F.3d 813, 818 (7th Cir. 1999). However, the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in the non-movant's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Finally, a scintilla of evidence in support of the non-movant's position is not sufficient to oppose successfully a summary judgment motion; "there must be evidence on which the jury could reasonably find for the [non-movant]." *Id*. at 250.

## A

The Plaintiff claims Defendant IDOC is liable for her alleged Title VII violations under the theory that IDOC and Defendant Wexford were her joint employers. *See Sklyarsky v. Means-Knaus Partners, L.P.*, 777 F.3d 892, 895 (7th Cir. 2015) (stating a "Title VII plaintiff might have *joint* employers" against whom he may pursue a Title VII claim) (emphasis in original). The Seventh Circuit employs a five-factor test to determine whether an entity not a plaintiff's direct employer had sufficient authority over her to be considered a "joint employer":

> (1) extent of the [purported] employer's control and supervision over the worker, including directions on scheduling and performance of work, (2) the kind of occupation and nature of skill required, including whether skills are obtained in the workplace, (3) responsibility for the costs of operation, such as equipment, supplies,

fees, licenses, workplace, and maintenance of operations, (4) method
and form of payment and benefits, and (5) length of job commitment
and/or expectations.

*Nischan v. Stratosphere Quality, LLC*, 865 F.3d 922, 929 (7th Cir. 2017).

Here, Defendant IDOC proffered evidence that the Plaintiff's paychecks
came from Wexford, Wexford assigned her work location, the Plaintiff selected her
own work shifts, she received employment-related manuals and policies from
Wexford and did not receive an IDOC employee handbook, her direct supervisor
was Dr. Sokol who was a Wexford employee, IDOC did not provide a uniform to
her, and IDOC did not furnish her with a copy of its dress code policy.  Defendant
IDOC also provided evidence that Wexford counseled and disciplined their own
staff, and IDOC did not discipline Wexford employees, including the Plaintiff.  The
Plaintiff cites evidence of a December 14, 2017 email[6] she received from a Wexford
email address confirming the Plaintiff's interview at Pontiac with Dr. Kelly Renzi,
Mental Health Services Director, and instructing the Plaintiff to fill out both the
Wexford application and the IDOC application.  She also cites the deposition
testimony of Anna Cummings, a previous Wexford employee who worked with
Jimia at Pontiac, who testified that Dr. Renzi was an IDOC employee, "the State's
psych administrator."  Plf Exh. 38 Cummings Dep. 45:21-24 (Doc. 128-3 at pg. 166).
Citing her own and others' deposition testimony, the Plaintiff says her office was
in IDOC's Pontiac, no supplies needed to perform her job were provided by
Wexford, training of Wexford employees was done through IDOC, her primary
superiors were IDOC supervisors, she had to abide by IDOC policies, and she was
disciplined by IDOC.

---

[6] Plaintiff's counsel represents this email was found by the Plaintiff in mid-July 2023, and both
Defendants knowingly failed to provide this email in discovery.

The Plaintiff's cited evidence does not present a triable issue.  As for the factor of control, "the key powers are, naturally, those of hiring and firing." *E.E.O.C. State of Ill.*, 69 F.3d 167, 171 (7th Cir. 1995).  That the Plaintiff was directed to fill out both an IDOC application and Wexford application is undermined by the fact that the communication appears to have come from someone at Wexford, and Jimia does not dispute she was hired by Wexford and addressed her resignation to only Wexford.  She does not dispute her paychecks came from Wexford or that Wexford employees are provided with Wexford employment manuals and policies.  Evidence of the State of Illinois' contract with Wexford wherein a provision states, "Work schedules [as to mental health coverage] shall be subject to approval by the IDOC and shall reflect the evolving needs of the facilities," is nothing more than evidence of Wexford's contractual obligations rather than an indication two entities are joint employers.  *See Am. Fed'n of State, Cnty. and Mun. Emps., Council 31 v. State Labor Relations Bd., State Panel*, 839 N.E.2d 479, 587 (Ill. 2005) ("one can 'control' the conduct of another contracting party by setting out in detail his obligations; this is nothing more than the freedom of contract. This sort of one-time 'control' is significantly different than the discretionary control an employer daily exercises over its employees' conduct") (quoting *Hojnacki v. Klein-Acosta*, 285 F.3d 544, 551 (7th Cir. 2002)).  Dr. Sokol testified, "Ms. Stokes chose the assigned days and hours she would be working based on the ones that were available" and that Wexford's staffing recruiter let Wexford employees know the days and shifts available from which to choose.  Dft IDOC Exh D. Sokol Dep. 33:3-5, 15-22 (Doc. 111-4 at pg. 34).

The Plaintiff does not dispute that Dr. Sokol (Wexford) had the ability and authority to discipline her.  Nevertheless, she says IDOC's ability and authority to discipline her are illustrated by IDOC's November 2018 Investigation into the Plaintiff's July 7, 2018 interaction with Lt. Henry in which the investigator

concluded (and the Warden concurred) the allegation that Jimia violated the Departmental Rule governing Conduct of Individual was substantiated based upon the two stated reasons.  Nothing in that document provides the Plaintiff was disciplined or would be disciplined by IDOC or Wexford as a result.  *See Am. Fed'n of State, Cnty. and Mun. Emps., Council 31*, 839 N.E.2d at 586 (stating evidence established Wexford had the sole ability to discharge any of its employees without input or approval from the IDOC and that the state "cannot and has never discharged a Wexford employee").  The Plaintiff has not cited any evidence to contradict Dr. Sokol's testimony that IDOC did not maintain an employee file regarding her.

Lastly – putting aside the evidence as it pertains to the Plaintiff's Title VII claims against Defendant Wexford – Dr. Sokol's testimony that IDOC exercised some degree of control over the dress of all inmates and visitors to the prison as "Inappropriate dress has the potential to become a safety and security issue" – strikes the final blow to the Plaintiff's joint employer theory of Title VII liability as to Defendant IDOC.  IDOC Exh. D Sokol Dep. 44:13-14 (Doc. 111-4 at pg. 45).  In *Hojnacki*, the Northern District of Illinois explained, "The fact that [the Medical Director at IDOC's Dwight Correctional Center] was subject to the prison's security regulations – her main argument against summary judgment – does not make her an employee of the IDOC."  No. 00 C 1356, 2001 WL 289786, at *4 (N.D. Ill. Mar. 15, 2001) (going on to quote favorably the reasoning that although "valid penological measures imposed to ensure safety and security within a facility may require a worker to fulfill certain conditions, those conditions do not rise to the level of 'control' for purposes of determining a worker's employment status with the correctional facility itself") (quoting *Zinn v. McKune*, 143 F.3d 1353 (10th Cir. 1998)), *aff'd*, *Hojnacki v. Klein-Acosta*, 285 F.3d 544, 551 (7th Cir. 2002) .  Accordingly, the Plaintiff's Title VII claims directed at Defendant IDOC must be dismissed as

only an employer can be liable under Title VII. *Bronson v. Ann & Robert H. Lurie Children's Hosp. of Chi.*, 69 F.4th 437, 448 (7th Cir. 2023) (citing *Love v. JP Cullen & Sons, Inc.*, 779 F.3d 697, 701 (7th Cir. 2015)).

### B

Title VII of the Civil Rights Act of 1964 provides, in relevant part, that "[i]t shall be unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex[.]"  42 U.S.C. § 2000e-2(a)(1). The question to be asked in a discrimination case is "simply whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action." *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016). "Evidence must be considered as a whole, rather than asking whether any particular piece of evidence proves the case by itself . . .  Relevant evidence must be considered and irrelevant evidence disregarded." *Id.*  The following framework "remains an efficient way to organize, present, and assess evidence in discrimination cases." *Johnson v. Advocate Health and Hosps. Corp.*, 892 F.3d 887, 894 (7th Cir. 2018).  To establish a prima facie case of sex discrimination, the Plaintiff must show:  1) she belongs to a protected class; 2) she met her employer's legitimate expectations; 3) she suffered an adverse employment action; and 4) another similarly situated employee outside of her protected class received better treatment from her employer.  *Id.* at 895.

### 1

Defendant Wexford argues the Plaintiff was not meeting its legitimate performance expectations where:  1) the Plaintiff was written up on May 16, 2018 for insubordination and being late to work with her supervisor expressing serious concerns about her performance; 2) was "coached" for wearing clothes through

which her nipples protruded and advised to wear clothes more appropriate for the workplace; 3) was found to have violated IDOC's Code of Conduct in November 2018 for her conduct displayed during the July 7th interaction with Lt. Henry; 4) she was counseled on July 17, 2018 by Drs. Sokol and Woods regarding the "emotional" or "passionate" manner in which she interacted at work and that it was not well received by IDOC personnel; and 5) on October 29, 2018, Major Wheat completed an IDOC Incident Report as a result of the Plaintiff not performing the type of assessment as was directed on an inmate and for being too tired to conduct an assessment on a different inmate.  With regard to the May 16th write-up, the Plaintiff disputes it relates to or cites performance expectations, and she says she was never cited for insubordination.  The Plaintiff cites her deposition testimony that Dr. Sokol did not observe her nipples because they were not protruding and others' deposition testimony that they did not observe the Plaintiff's nipples.  She disputes the date Dr. Sokol counseled her as to her nipples. The Plaintiff does not dispute that IDOC concluded the allegations against the Plaintiff that she violated IDOC's Code of Conduct were "substantiated."  The Plaintiff does not dispute that Drs. Sokol and Woods met with her on July 17, 2018 regarding her communication style.

The undisputed evidence shows that concerns with the Plaintiff's performance were discussed with her on May 16, 2018, specifically pertaining to ignoring repeated directives to leave her immediate supervisor's office and arriving late to her shift on three consecutive days, that allegations she violated IDOC's Code of Conduct were substantiated in November 2018, and that Major Wheat[7] completed an IDOC Incident Report in October 2018 in which he reported

---

[7] The Plaintiff denied any interaction with Major Wheat in her August 6, 2023 Declaration in support of her opposition to the Defendants' Motions for Summary Judgment.  However, as explained above, the entirety of that Declaration has been stricken and is not being considered by the Court.

the Plaintiff said she was "too tired" to conduct an inmate assessment that was requested by the inmate and would do a different assessment.  Dft Wexford Exh. F (Doc. 135 at pgs. 7, 40); Exh. J (Doc. 113-10 at pg. 6).  The Plaintiff points to the absence of evidence – i.e. no performance improvement plan – and otherwise argues Wexford's position is that a plaintiff cannot bring a viable lawsuit for sexual harassment unless she was performing her job duties satisfactorily.  The Plaintiff premises her argument on the fact that some of Wexford's cited evidence as to legitimate performance expectations is that she was coached as to proper work attire (which she says is really about her nipples such that it was sexual harassment).  Putting aside evidence of Dr. Sokol's instruction to be more mindful of her attire, which the Plaintiff testified at her deposition was not said to her on May 16th, and considering the evidence as a whole with regard to performance expectations, there is no material dispute of fact; there were instances where the Plaintiff was not meeting Wexford's legitimate performance expectations.

## 2

Even if the Court were to find a genuine dispute existed as to the Plaintiff not meeting Wexford's legitimate performance expectations, her sex discrimination claim fails upon consideration of the fourth factor – whether another similarly situated employee outside of the Plaintiff's protected class received better treatment from her employer.  "Though similarly situated employees need not be identical in every conceivable way, they must be directly comparable to the plaintiff in all material respects."  *Reives v. Ill. State Police*, 29 F.4th 887, 892 (7th Cir. 2022).  "The question is whether the other employees' situations were similar enough to the plaintiff's that it is reasonable to infer, in the absence of some other explanation, that the different treatment was a result of race or some other unlawful basis."  *Luster v. Ill. Dep't of Corr.*, 652 F.3d 726, 730 (7th Cir. 2011).

Here Defendant Wexford argues there is no evidence of Wexford treating a similarly situated male employee more favorably, rather, the evidence demonstrates that three other employees, including one male, were also "counseled" for their work attire.[8]  Devhin White-Peck, a black male mental health counselor at IDOC's prison in Joliet, Illinois, received verbal counseling for wearing a t-shirt that was too tight and form fitting for his muscular physique.  Dft Wexford Exh. O (Doc. 113-15 at pg. 1).  The Plaintiff counters that Dr. Woods testified at his deposition that in addition to displaying Devhin's physical features, the comic representation on Devhin's shirt was not appropriate for mental health professionals within Wexford's staff.  Plf Exh. 31 Woods Dep. 43:2-10 (Doc. 128-3 at pg. 33).  The Plaintiff also points to Devhin's case in the Northern District of Illinois in which he alleged he was cited because of his biologically racially based anatomy.  *White-Peck v. Wexford Health Sources*, No. 1:22-cv-01856 (N.D. Ill.); *see Opoka v. I.N.S.*, 94 F.3d 392, 394 (7th Cir. 1996) ("Indeed, it is a well-settled principle that the decision of another court or agency, including the decision of an administrative law judge, is a proper subject of judicial notice").

The Plaintiff's reliance on evidence pertaining to Devhin is misplaced.  The Plaintiff must come forward with evidence of a similarly situated male employee treated *more* favorably than she.[9]  *Bragg v. Munster Med. Research Found. Inc.*, 58 F.4th 265, 271 (7th Cir. 2023).  The Plaintiff otherwise cites deposition testimony by

---

[8] Dr. Sokol told Carmen Pickering, a white female who works as a Behavioral Health Therapist for Wexford at Pontiac, in the summer of 2019 that someone had noticed her nipples were protruding.  Dft Wexford Exh. M Pickering Dep. 14:11-14 (Doc. 113-13 at pg. 3).  Pickering explained she understood her nipples to create a safety and security issue, and "When you walk into the doors of [Pontiac], it's a different world inside and there's a lot of different things that you have to be aware of so that you don't provoke any bad behavior."  *Id.* at 26:20-24.  Suzette Trammel, a Hispanic female Wexford employee who worked at Dixon Correctional Center, received verbal counseling on July 10, 2018 for wearing shorts to Dixon.  Dft Wexford Exh. O (Doc. 113-15 at pg. 1).

[9] The Court takes further judicial notice that the Northern District dismissed without prejudice Devhin's race discrimination, harassment, and hostile work environment count brought pursuant to Section 1981 on March 14, 2024.  No. 1:22-cv-01856, Dkt. 46 (N.D. Ill.).

previous Wexford employee Anna Cummings, by the Plaintiff, by Dr. Woods, and by Warden Terri Kennedy. All of that testimony was not definitive. Instead, Anna testified she did not know of male employees who were told to spin their bodies around for IDOC. Plf Exh. 31 Cummings Dep. 15:4-8 (Doc. 128-3 at pg. 158). The Plaintiff testified that *not to her knowledge* had a male correctional officer been cited for a protruding penis, testicles, chest, or nipples. Plf Exh. 5 Stokes Dep. 176:13-22 (Doc. 128-1). Warden Kennedy testified she did not recall ever citing a male staff member for a protruding penis and that she cited none of IDOC's male officers at Pontiac for having large muscles. Plf Exh. 33 Kennedy Dep. 22:18-22; 23:5-14 (Doc. 128-3 at pg. 77). Dr. Woods testified that he did not recall having a conversation with a man about protruding nipples and did not counsel a man about a protruding penis or testicles. Plf Exh. 41 Woods Dep. 41:18-24; 42:1-2 (Doc. 128-3 at pg. 33). None of that deposition testimony amounts to the identification of a similarly situated male employee who was treated better. *See also* Plf Exh. 68 (Doc. 128-6 at pg. 34) (Wexford answering "Denied" to Plaintiff's Request to Admit that "Between January 1, 2009, and January 1, 2019, WEXFORD did *not* counsel a male employee for having presented himself in the workplace (to include at an IDOC site) with a protruding NIPPLES [sic]") (emphasis added).

While the similarly situated question is usually one of fact for the jury, the plaintiff first must have "produced enough evidence to reach trial and survive judgment as a matter of law." *Andy Mohr Truck Ctr., Inc. v. Volvo Trucks N. Am.*, 869 F.3d 598, 604 (7th Cir. 2017). Of note, on the face of things, a correctional officer and a mental health professional are not directly comparable in all material respects and thus not similarly situated. More importantly, no specific man or men have been identified against whom to inquire "whether there are sufficient commonalities on the key variables between the plaintiff and the would-be comparator to allow the type of comparison that, taken together with other *prima*

*facie* evidence, would allow a jury to reach an inference of discrimination." *Eaton v. Ind. Dep't of Corr.*, 657 F.3d 551, 556 (7th Cir. 2011). "Summary judgment is appropriate where it is clear that no reasonable jury could find that the similarly situated requirement has been met." *Fares Pawn, LLC v. Ind. Dep't of Fin. Insts.*, 755 F.3d 839, 846 (7th Cir. 2014). That is the situation here.

## C

To prevail on her claim of sexual harassment, the Plaintiff must show: 1) she was subjected to unwelcome sexual harassment in the form of sexual advances, requests for sexual favors, or other verbal or physical conduct of a sexual nature; 2) the harassment was based on her sex; 3) the sexual harassment had the effect of unreasonably interfering with her work performance in creating an intimidating, hostile, or offensive working environment that seriously affected her psychological well-being; and 4) a basis for employer liability exists. *Durkin v. City of Chi.*, 341 F.3d 606, 611 (7th Cir. 2003). Defendant Wexford addresses only the second and third factors.

## 1

Defendant Wexford argues there is no question the Plaintiff's same-sex harassment by Lt. Henry on July 7, 2018 was *not* "based on sex," and the remainder of the Plaintiff's complained of conduct was not based "on sex." To support a same-sex harassment claim, the plaintiff "must always prove that the conduct at issue was not merely tinged with offensive sexual connotations, but actually constituted 'discrimination . . . because of . . . sex.'" *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998) (citing 42 U.S.C. § 2000e-2). Overall, "The critical issue, Title VII's text indicates, is whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed." *Id.* at 80.

21

Here, Defendant Wexford argues there is no evidence of the exemplar ways to show same-sex harassment by Lt. Henry on July 7, 2018. *See Oncale*, 523 U.S. at 80-81 (providing same-sex harassment may be shown by evidence that a female victim was harassed in such sex-specific and derogatory terms by another woman as to make it clear that the harasser is motivated by general hostility to the presence of women in the workplace and by direct comparative evidence about how the alleged harasser treated members of both sexes in a mixed-sex workplace).   It surmises the remainder of the Plaintiff's sexual harassment claim consists of particular incidents, all of which were not based on Jimia's sex merely because the words used had sexual content or connotations.   Those incidents included: Assistant Warden Ruskin's June 21, 2018 inquiry of the Plaintiff as to whether she wore a shirt that exposed her belly; the Plaintiff's July 14, 2018 report of feeling marginalized by IDOC security staff based upon what an inmate reported to her he overhead (including he overheard Major Prentice tell Jimia to cover up); and Lt. Brewer's July 21, 2018 statement to the Plaintiff that the former heard Major Wheat jokingly refer to himself as the "nipple police."

The Plaintiff underscores she is a woman, identifies as a woman, and has body features associated with female sexuality and femininity.   She points to: Warden Kennedy's deposition testimony that she never cited a male for a protruding penis; and Dr. Woods's deposition testimony that he did not recall ever counseling a man about protruding nipples and did not counsel a man about a protruding penis or testicles.   The Plaintiff adds that Assistant Warden Ruskin could see the Plaintiff was not actually wearing a crop top on June 21, 2018, she was subjected to a "slave block"[10] forced spin around (Plaintiff's words) by

---

[10] The Plaintiff included Title VII claims for sex discrimination and sexual harassment in her Second Amended Complaint, but she did not include a Title VII claim for race discrimination.   *See* Plf's 2d Amend. Compl. (Doc. 76 at pgs. 7, 10).   Nevertheless, she has presented evidence pertaining to her race in support of her Title VII sexual harassment claim.

22

Assistant Warden Ruskin and Major Prentice on July 11, 2018, another female – Carmen Pickering – was counseled about her nipples protruding, and a third female – Anna Cummings – was subjected by IDOC employees to spin her body around so they could inspect her body and attire whereas she did not know of male employees who were told to spin their bodies around for IDOC.  Plf Exh. 5 Stokes Dep. 88:7-9; 89:4-12 (Doc. 128-1).

To the extent Wexford argues the evidence shows the harassment occurred *not because of sex* but because of some other non-gender related reasons (prison safety and security via enforcement of rules regarding attire of those entering Pontiac), there remains a question for the jury.  Of note, "What matters . . . is not whether the facts . . . correspond exactly to any of the examples the Supreme Court has identified [for purposes of demonstrating sex harassment], but whether a reasonable factfinder could infer from those facts that [the plaintiff] was harassed 'because of' his sex."  *Shepherd v. Slater Steels Corp.*, 168 F.3d 998, 1009 (7th Cir. 1999).  The pertinent evidence goes beyond the July 7, 2018 incident involving the Plaintiff and Lt. Henry.  There is evidence that the Plaintiff (and other females) was counseled about her attire simply for purposes of prison regulations and Wexford's expectations its employees comply with those regulations *and* that male workers at Pontiac (IDOC and Wexford) were nevertheless not subjected to the same types of counseling, inquiry, inspection, or reprimand regarding attire.  *See Bostock v. Clayton Cnty., Ga.*, 590 U.S. 644, 664 (2020) (clarifying that the *Oncale* court determined a triable Title VII claim existed "[b]ecause the plaintiff alleged that the harassment would not have taken place but for his sex – that is, the plaintiff would

23

not have suffered similar treatment if he were female").[11]   At the very least, differing reasonable inferences could be drawn from the evidence of record.

2

As to the third element of the Plaintiff's sexual harassment claim, Defendant Wexford argues the conduct at issue, individually or cumulatively, is neither severe nor pervasive to create an objectively hostile or abusive work environment in any workplace setting, let alone at Pontiac.  In deciding whether a work environment is hostile requires consideration of factors including the frequency of improper conduct, its severity, whether it is physically threatening or humiliating as opposed to a mere offensive utterance, and whether it unreasonably interferes with the employee's work performance. *Boss v. Castro*, 816 F.3d 910, 920 (7th Cir. 2016).

Defendant Wexford highlights evidence that Pontiac is considered a tough and dangerous environment, and the Plaintiff's wardrobe was addressed in furtherance of her and others' safety in that environment.  Dft Wexford Exh. G Woods Dep. 49:17-23; 49:23-50:2 (Doc. 113-7 at pgs. 3-4).   The evidence also presents a timeline of events illustrating that between May 16, 2018 and July 21, 2018, the Plaintiff believed and alerted others/others alerted her that her body was under a microscope at Pontiac.  Dr. Sokol testified that on May 16, 2018, he observed what he thought to be the Plaintiff's nipples protruding and so told her to cover up and be more mindful of her attire at work.  On June 21, 2018, Assistant Warden Ruskin asked the Plaintiff if she was wearing a shirt with her belly showing that day because someone had reported it to her.  That same day, the Plaintiff submitted a Wexford Incident Report claiming that report was false and

---

[11] There is enough evidence to create a genuine dispute without consideration of what an inmate purportedly told the Plaintiff he overheard or that Lt. Brewer purportedly told the Plaintiff Major Wheat referred to himself as the "nipple police," both statements of which Defendant Wexford argues are inadmissible hearsay.

that type of workplace scrutiny made her uncomfortable and unfairly targeted due to being a minority.  On July 7, 2018, the incident involving the Plaintiff and Lt. Henry occurred.  Though disputed, Dr. Sokol testified he received a text message that same day from Assistant Warden Ruskin alerting him to the incident between the Plaintiff and Lt. Henry that day and he recalled the manner in which the Plaintiff dressed "riled up" the prisoners.  Dft Wexford Exh. C Sokol Dep. 36:13-22; 50:22-23 (Doc. 113-3 at pgs. 8, 14).  Via emails sent on July 7, July 10, July 11, July 14, and July 21, 2018 to varying groups of individuals (both Wexford and IDOC) and to herself, the Plaintiff addressed:  the July 7th incident with Lt. Henry and/or otherwise complained of Lt. Henry's interaction with her that day; asked for help; brought up the "false" accusation that she was showing her underwear to inmates and that she was ordered to lift up her shirt and show her backside to show she was wearing underwear that was not visible; that she felt alone and her experiences minimized and accordingly asked to meet with someone who would help her; that being subjected to the type of treatment and communication she received regarding her nipples made her feel scrutinized and objectified unfairly given that she was the only African American mental health professional in a predominately Caucasian workforce; that an inmate overheard her be referred to as "nipple girl;"  and that she told a lieutenant that discussion of the July 7th incident made her uncomfortable and hurt her professional reputation.  Plf Exhs. 8 (Doc. 128-1 at pg. 353), 10 (Doc. 128-1 at pg. 362), 11 (Doc. 128-1 at pg. 365), 12A (Doc. 128-1 at pg. 373), 18 (Doc. 128-1 at pg. 393).

In addition to emails, the record contains the Plaintiff's July 10, 2018 Wexford Incident Report regarding the July 7th incident and her July 14th Wexford Incident Report in which she stated an inmate reported to her that he overheard Major Prentice had told the Plaintiff to cover up.  Dft Wexford Exhs. F (Doc. 135 at pg. 23), L (Doc. 135 at pg. 14).  At her deposition, the Plaintiff stated

she was called into Dr. Sokol's office because there was a report she was wearing leggings and her understanding of such a report was that her body was being talked about; she said it humiliated her.  Plf Exh. 5 Stokes Dep. 106:24-107:3; 109:4-19 (Doc. 128-1).

Though the objective severity inquiry "requires careful consideration of the social context in which particular behavior occurs and is experienced by its target," the Court is precluded from finding the prison context is alone enough to defeat the Plaintiff's claim of sexual harassment.  *Oncale*, 523 U.S. at 81.  There is enough evidence to create a factual dispute as to whether the conduct of which the Plaintiff complains amounted to a hostile work environment, particularly where the "real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed." *Id*. at 82.  Here, the Plaintiff articulated in complaints that the conduct to which she was subjected felt especially problematic to her as she was the only African American.  Also, Wexford wishes to exclude as hearsay the evidence that an inmate reported he overheard Major Prentice had told the Plaintiff to cover up, that the Plaintiff was referred to as "nipple girl," and that Major Wheat referred to himself as the "nipple police."  At her deposition, the Plaintiff stated an inmate and then a member of the security staff told her things were being said about her. Plf Exh. 5 Stokes Dep. 120:19-23 (Doc. 128-1).  On the whole, these instances toe the line as being hearsay, and even double hearsay.  However, the evidence that the Plaintiff was told she was referred to as "nipple girl" is evidence that goes to the question of the effect it had on its listener – Jimia – and not merely evidence offered to prove the truth of the matter asserted.  *See Cooper-Schut v. Visteon Auto. Sys.*, 361 F.3d 421, 430 (7th Cir. 2004) (finding the district court correctly treated evidence that another employee told the plaintiff a competition existed among employees

to see who would have sex with the plaintiff first as hearsay "and only let it in for the effect that it had on its listener"); *Johnson*, 892 F.3d at 903 ("We would caution against elevating workplace rumors to evidence of a hostile work environment, although coupled with other evidence this testimony might have relevance in a hostile work environment claim").

### D

Title VII prohibits an employer from discriminating against an employee "because [s]he has opposed any practice made an unlawful employment practice by" Title VII. *Igasaki v. Ill. Dep't of Fin. and Prof'l Regulation*, 988 F.3d 948, 959 (7th Cir. 2021) (citing 42 U.S.C. § 2000e-3(a)). To defeat summary judgment, the Plaintiff must offer evidence from which a reasonable jury could find: 1) she engaged in an activity protected by the statute; 2) she suffered an adverse employment action; and 3) there is a causal link between the protected activity and the adverse action. *Lesiv v. Ill. Cent. R.R. Co.*, 39 F.4th 903, 911 (7th Cir. 2022). As with a sex discrimination claim, "Ultimately, the inquiry comes down to one question: 'Does the record contain sufficient evidence to permit a reasonable fact finder to conclude that retaliatory motive caused' the materially adverse action?" *Id.* (quoting *Lord v. High Voltage Software, Inc.*, 839 F.3d 556, 563 (7th Cir. 2016)).

### 1

Defendant Wexford argues from neither a subjective nor objective standpoint was the Plaintiff's opposition to activity protected by her claimed rights (e.g., sex) under Title VII where she did not even complain in general terms of discrimination or harassment connected to a protected class. *Scheidler v. Ind.*, 914 F.3d 535, 542 (7th Cir. 2019) ("The plaintiff must not only have a subjective (sincere, good faith) belief that he opposed an unlawful practice; his belief must also be objectively reasonable, which means that the complaint must involve discrimination that is prohibited by Title VII"). Wexford points to the Plaintiff's

communications with Lt. Henry and Major Wheat on July 7, 2018, the several emails the Plaintiff sent regarding the July 7th incident, her July 17, 2018 Wexford Incident Report expressing concern that IDOC staff was filing complaints against her behind her back in retaliation for her July 7th complaint against Lt. Henry, and her September 28, 2018 IDOC Incident Report against Corrections Officer Griffith for making the Plaintiff wait at a security point for one minute during which time the Plaintiff felt she was being placed in an unsafe environment.

The Plaintiff cites her July 7, 2018 IDOC Incident Report detailing the incident with Lt. Henry and reporting that being told to cover her nipples suggested that her nipples were exposed to intentionally express her sexuality. Plf Exh. 9 (Doc. 128-1 at pgs. 359-61). She cites her July 10th Wexford Incident Report in which she reported that she alerted both Lt. Henry and Major Wheat that she felt her sexuality rather than her attire had been addressed that day and that she made reference to the possibility "of [Lt. Henry] now making my anatomy a subject of discussion and subjecting me to unwarranted attention by the staff and/or inmates." Plf Exh. 7 (Doc. 128-1 at pgs. 350-51). She cites her July 7th email to Drs. Woods and Renzi and Major Wheat in which she reiterated the details of her July 7th IDOC Incident Report, stated she felt violated and objectified, her "anatomy is unique to me," and stated she was the only African American[12] Mental Health Professional in a predominately Caucasian work force to be subjected to treatment and communication which made her feel scrutinized which was "unjustifiable if all members of the staff are not assessed according their [sic] anatomy." Plf Exh. 8 (Doc. 128-1 at pgs. 353-54). She cites her July 10, 2018 email and attached letter sent to Dr. Sokol, Fitzmaurice, Dr. Woods, Dr. Renzi, and a

---

[12] As with the Plaintiff's reference to her race in connection with her sexual harassment claim, that evidence is for the jury to consider its significance or lack thereof for purposes of her sex discrimination and retaliation claims.

union representative in which she again reiterated the July 7th incident with Lt. Henry and stated in conclusion, among other things:

> I do not take issue with adhering to the dress code or following any directive given to me by security staff or any supervisor. However, I will not accept or be subjected to any sexualized behavior or references to my natural anatomy as something to be described in what I perceive and felt was vulgar in nature by the biased opinions of Lt. Henry and her referencing that my anatomy (nipples) have been the subject of conversation among other staff members . . . .

Plf Exh. 10 (Doc. 128-1 at pg. 363). All this is evidence upon which a jury could find that the Plaintiff complained of sex discrimination and harassment given that she repeatedly referred to her anatomy and her nipples, the latter allowing an inference she was specifically indicating the conduct complained of occurred because of her sex.

### 2

Stating not everything that makes an employee unhappy is an actionable adverse action, Defendant Wexford argues the "counseling" the Plaintiff received, the alleged retaliatory harassment she complained of, the alleged stray comments the Plaintiff heard, and unserved corrective actions do not amount to an adverse employment action. "The challenged action must be one that a reasonable employee would find to be materially adverse such that the employee would be dissuaded from engaging in protected activity." *Lewis v. City of Chi.*, 496 F.3d 645, 655 (7th Cir. 2007).

The Plaintiff has pointed to sufficient record evidence to create a jury question as to this factor. In her July 14, 2018 email to Dr. Sokol, the Plaintiff stated Dr. Sokol informed her he was waiting for Dr. Woods to get back with him regarding Jimia's Incident Report, and she requested a meeting with someone to help her "to not feel that I am all alone[.]" Plf Exh. 12A (Doc. 128-1 at pg. 373). She

submitted several complaints about the July 7th incident, all of which she testified fell on deaf ears. Plf Exh. 5 Stokes Dep. 106:6-12 (Doc. 128-1). In her July 17, 2018 Wexford Incident Report, the Plaintiff explained how she was told an incident was reported about her with regard to overstepping her professional boundaries, and she expressed concern that incident reports were being written by Pontiac staff (security, medical, mental health) in retaliation for her previous July 7th incident report pertaining to Lt. Henry. Plf Exh. 25 (Doc. 128-3 at pgs. 11-12).

At her deposition, the Plaintiff testified that she felt Assistant Warden Ruskin and Major Prentice were playing a game with her on July 11, 2018 for filing the July 7th Incident Report when she was given the command to show them her underwear was not visible which made her feel like she was on a "slave block." Plf Exh. 5 Stokes Dep. 89:4-12; 91:5-11 (Doc. 128-1). She testified that she did not know who accused her of wearing leggings on July 21, 2018, the report of which ("Somebody never had a name. It was always somebody") caused Dr. Sokol to call her into his office. *Id*. at 106:18-19, 24-25; 107:1-8. She also testified that on a particular day she noticed IDOC was bringing inmates out to her slowly and taken them out slowly on a hot day which created safety issues for her and doubled the time she spent, and she felt that day's events formed part of the "totality of adverse actions" being made toward her. *Id*. at 97:14-23. She testified she believed her delayed entry into the mental health building at Pontiac by Officer Griffith was done in response to the Plaintiff's complaints. *Id*. at 69:20-80:1-3. The Plaintiff's Incident Report completed that day included that she was concerned she was being placed in an unsafe work environment due to correctional staff retaliating against her for submitting an incident report concerning another correctional officer the previous day (regarding the CO reportedly pushing an inmate in crisis) and *not* for her complaints about being sexualized. That presents a credibility question which is for the jury to resolve. *Johnson*, 892 F.3d at 893 (stating the

"common refrain[]" that a court may not make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts on summary judgment as those are jobs for the factfinder) (quoting *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003)).

Defendant Wexford essentially asks the Court to find that, as a matter of law, the Plaintiff's November 2018 resignation cannot be considered a constructive discharge where the evidence is devoid of working conditions at Wexford so intolerable from an objective standard that a reasonable person in the Plaintiff's position would have felt compelled to resign. But as determined above, there is a genuine dispute as to whether the conditions to which the Plaintiff was subjected rose to the level of "hostile," regardless of the prison context. Moreover, there is evidence that the Plaintiff did not just once alert Wexford (and IDOC) to the issues she had with her anatomy (sexuality as she often refers to it as), but she did so on several occasions within a short amount of time to no avail. She said her concerns fell on deaf ears as no one responded to her complaints. Plf Exh. 5 Stokes Dep. 106:6-12 (Doc. 128-1); *see Boumehdi v. Plastag Holdings, LLC*, 489 F.3d 781, 790 (7th Cir. 2007) (finding a jury could conclude that a reasonable person in the plaintiff's position would feel she had no choice but to resign where even though the defendant had numerous opportunities to respond to the situation, the plaintiff's alleged complaints fell on deaf ears).

The foregoing is evidence of retaliatory actions from which a reasonable jury could find those actions would dissuade a reasonable employee from engaging in protected activity in the future. *Lesiv*, 39 F.4th at 912.

### 3

To meet her burden on causation, the Plaintiff must offer evidence that "the desire to retaliate was the but-for cause of the challenged employment action." *Gracia v. SigmaTron Int'l, Inc.*, 842 F.3d 1010, 1019 (7th Cir. 2016) (quoting *Univ. of*

*Tex. Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2528 (2013)).  Defendant Wexford argues the alleged adverse actions of which the Plaintiff complains would have been taken against her had she not complained where:  her continued non-compliance with the dress code caused her alleged mistreatment; she had already been counseled for performance related reasons including wearing clothes that allowed her nipples to protrude prior to her complaints; the record is void of any issues arising as to the Plaintiff's mistreatment for over four months prior to her resignation; and the Plaintiff believed Officer Griffith's conduct on September 28th was in retaliation for the Plaintiff's September 27th complaint against a different officer for the mistreatment of an inmate.

At her deposition, the Plaintiff testified that she did not recall Dr. Sokol talking to her about her nipples on May 16, 2018 – *before* the incident with Lt. Henry – as her nipples were not even a topic of conversation nor did he ever say anything to her about her nipples.  Plf Exh. 5 Stokes Dep. 250:16-251:12 (Doc. 128-1).  She also testified that she was subjected to the inspection of her clothing by Assistant Warden Ruskin and Major Prentice on July 11, 2018 because of the report she made about Lt. Henry on July 7th.  *Id*. at 91:5-11.  *See Gracia*, 842 F.3d at 1019 ("Retaliatory motive may be established through circumstantial evidence such as suspicious timing, ambiguous statements, evidence that the stated reason for the employment decision is pretextual and other evidence from which an inference of discriminatory intent might be drawn").  She testified that IDOC staff knew about the reports she had been making "[b]ecause of the culture there at Pontiac.  It's a very family type of kind of environment . . . So I knew that I was a subject – a topic of conversation just because of the real change to how they were treating me."  Plf Exh. 5 Stokes Dep. 98:13-15; 99:24-99:1 (Doc. 128-1).

As for the September 28, 2018 instance when the Plaintiff was made to wait between entry doors, the parties offer conflicting explanations for why that

occurred which, as explained above, is for the jury to resolve. While there is a gap between July 2018 and the Plaintiff's resignation in November 2018, the record is not so devoid of evidence dated during that gap – such as the September 28th delayed entry incident – that not even an inference as to causation may be drawn. *See Igasaki*, 988 F.3d at 960 ("When suspicious timing alone is insufficient to carry the plaintiff's burden, a plaintiff may survive summary judgment if there is other evidence that supports the inference of a causal link) (internal quotations omitted).

## IV

For the foregoing reasons, Defendant IDOC's Motion (Doc. 111) is GRANTED and Defendant Wexford's Motion (Doc. 114) is GRANTED IN PART AND DENIED IN PART. Wexford's Motion is granted as to the Plaintiff's Title VII sex discrimination claim and is denied as to the Plaintiff's Title VII sexual harassment and retaliation claims. The Plaintiff's Emergency Motion to Strike Defendant Wexford's Dkt 114 Statement of Facts & Dkt 131, Its Reply Brief, and for Rule 11 Sanctions & a Prayer for Leave to Amend a Rule 56 Response if Necessary with Plaintiff's Counsel Withdrawal (Doc. 132) is DENIED.

The Final Pretrial Conference in this case is re-set for July 29, 2024 at 2:00 p.m., and the Jury Trial is re-set for August 12, 2024 at 9:00 a.m., both in Courtroom C in Peoria before Magistrate Judge Jonathan E. Hawley. The parties' joint Proposed Final Pretrial Order is due on or before July 15, 2024. The Proposed Final Pretrial Order shall include as exhibits a list of each parties' witnesses and whether they will appear in person or by video; a joint list of exhibits, if any, to which the parties agree to their admissibility; a list of exhibits to which a party objects and the basis for the objections; joint jury instructions on which the parties agree; and each party's own instructions to which another party objects. The combination of the joint instructions and each party's separately offered instructions should, in that party's view, constitute all the instructions the Court would give to the jury.

If a party objects to another party's instruction, it should offer an alternative instruction, unless the party believes that the particular instruction should not be given at all.  Motions in limine are due on or before July 1, 2024 and responses thereto are due on or before July 15, 2024.

*It is so ordered.*

Entered on March 28, 2024.

<u>s/Jonathan E. Hawley</u>
U.S. MAGISTRATE JUDGE